UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| BRANDYWINE HEIGHTS AREA<br>SCHOOL DISTRICT, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | No. 5:14-cv-06624 |
| | : | |
| B.M., *by and through his parents, B.M. and J.M.*; | : | |
| and B.M. and J.M., *in their own right*, | : | |
| | : | |
| Defendants. | : | |

_____

## O P I N I O N

**Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 25:
Granted in Part and Denied in Part**

**Defendants' Motion for Judgment on the Administrative Record, ECF No. 26:
Granted in Part and Denied in Part**

**Joseph F. Leeson, Jr.**                                               **March 28, 2017**
**United States District Judge**

### I.      Introduction

B.M. is a student with autism who attends school in the Brandywine Heights Area School District. He entered Brandywine Heights as a kindergartener, transitioning to the District from an early intervention program. Concerned that Brandywine Heights was not affording B.M. the free appropriate public education he is entitled to under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, his parents requested a due process hearing partway through B.M.'s first-grade year. They argued that the District waited too long to begin planning for his arrival, did not have an appropriate plan in place for him when he arrived, and failed to provide him with a meaningful educational benefit during his kindergarten and first-grade years. The hearing officer concluded that the District initially failed to account for and control certain disruptive behaviors that B.M. had exhibited at times during the early intervention program, depriving him of a meaningful educational benefit for much of his kindergarten year and entitling him to compensatory education for that period of time. But, the hearing officer concluded that the District rectified the problem toward the end of B.M.'s kindergarten year and has been providing B.M. with a free appropriate public education since that time.

Neither side was entirely pleased with that outcome. The District believes that it has provided B.M. the education he is due under the IDEA since the time he arrived, while B.M.'s

parents[1] maintain that no part of B.M.'s first two years at the District provided him with a meaningful educational benefit. The Court largely agrees with the hearing officer's decision, with one difference of opinion about the amount of compensatory education that B.M. is due.

## II.     Background

B.M. began receiving special education services soon after he was born. He participated first in a birth-to-three early intervention program before transitioning to a preschool early intervention program. In early 2011, partway through B.M.'s second year at the preschool early intervention program, his parents met with representatives of Brandywine Heights to consider transitioning him to kindergarten, but they ultimately decided to keep him in the early intervention program for an additional year.

In January 2012, B.M.'s parents met again with District representatives. This time, they signed an intent-to-register form, committing B.M. to start kindergarten at Brandywine Heights in the fall. During that meeting, the District representatives informed B.M.'s parents that they planned to conduct a reevaluation of B.M. as part of their transitioning planning, and they explained that they would be sending a permission-to-reevaluate form that would need to be completed to authorize them to conduct the reevaluation. But the District did not mail the form until April 24, more than three months later. According to Brandywine Heights's director of special education, it is the District's policy to wait until the month of April to issue permission-to-reevaluate forms for students transitioning from early intervention programs; as she put it, "That is how we've always functioned."[2]

B.M.'s mother claims that she did not receive the form in the mail until May 7. Concerned that the reevaluation might not begin in time to be completed before B.M. started kindergarten, she hand-delivered the form to the District three days later. Pennsylvania regulations allow schools sixty days from the date of parental consent to complete student reevaluations, not counting the summer months between school years. 22 Pa. Code § 14.124(b). The District completed the reevaluation on September 6—eleven days after B.M.'s first day of kindergarten.

The following day, the District convened a meeting with B.M.'s parents to discuss the reevaluation and the District's overall individualized education program (IEP) for B.M. An IEP is a "comprehensive plan" that a school district must prepare for each disabled student, which must "include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, No. 15-827,

---

[1]     Both B.M. and his parents are parties to this suit, but for convenience of reference, the Court will simply refer to his parents throughout.

[2]     Hr'g Tr. 251:24-252:18, ECF No. 7 (docket entry number 7 contains the administrative record).

2017 WL 1066260, at *4 (U.S. Mar. 22, 2017). The development of an IEP for each disabled student is "the centerpiece of the [IDEA's] education delivery system for disabled students." *Id.* (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). An IEP had been created for B.M. while he was attending the early intervention program (and it had been updated fairly recently, in May 2012), but the District's plan was to craft a new IEP that would be tailored to the learning environment at Brandywine Heights and that would incorporate insights from the reevaluation.

At the meeting, B.M.'s parents reviewed the reevaluation with various representatives of the District, but after more than two hours spent discussing it, they ran out of time before they could discuss the IEP. As a result, the District scheduled a second meeting to take place twelve days later, on September 19.

B.M.'s parents penned a letter to the District on the 12th, expressing their frustration that a new IEP was still not in place. In the absence of a new IEP, the District had been following the early intervention IEP, but his parents were concerned that the early intervention IEP did not account for some of the changes in B.M.'s environment, such as the need for a "plan [to] be put in place to prevent him eloping [from school grounds] . . . [and] a plan for end of day dismissal [procedures]."[3] But there were also other, more troubling issues with B.M.'s transition to Brandywine Heights. Within his first few days, he exhibited some physically aggressive behavior, including grabbing a teacher's hand and using it to strike himself in the head and physically disrupting group activities with other students. B.M. had a history of striking himself in the head, as well as striking others with his head when frustrated (behavior the parties refer to as "head-butting"), but those behaviors had appeared to wane during his last year in the program. Now, they seemed to be reappearing as he acclimated to a new environment.

On the 18th—one day before the planned IEP meeting—B.M.'s parents wrote again to the District, this time to express their belief that the reevaluation that had been reviewed with them at the September 7th meeting suffered from a number of deficiencies that would hamper the creation of an appropriate IEP. They asked the District to arrange for another evaluation of B.M., this time by an independent examiner, at the District's expense. The District responded the following day, telling them that it had agreed to their request. *See* 34 C.F.R. § 300.502 (providing that if a parent disagrees with an evaluation conducted by a school and requests an independent examination, the school has only two options: convene a due process hearing to prove that the school's examination was proper, or pay for the independent examination).

The IEP meeting scheduled for that day still went ahead as planned, and the District presented B.M.'s parents with a draft IEP as well as a recommendation that B.M. be placed in a full-time learning support classroom at the school. In a written response sent a week later, his parents informed the District that they disagreed with the plan because they believed that it did not adequately address certain concerns they had raised at the meeting, and they also mentioned

---

[3]     Ex. S-7 (references to exhibits refer to the exhibits contained in the administrative record).

that the plan would need to be revisited after receiving the results of the independent examination.

Over the next few weeks, B.M. engaged in more disruptive behavior. During one episode, which occurred when he was allowed to join the rest of his kindergarten class in the library, he "refused to sit in his seat, and began scripting[4] loudly and crawling around on the floor" before "[running] through the class blindly and yelling" and becoming "extremely loud and agitated."[5] Concerned for the safety of the class, two teachers had to remove B.M. from the library. Another incident occurred during a group speech session. Frustrated that he could not access a musical instrument that other students were using, he struck another student with his head. A similar incident occurred the following day during lunch with his class, where B.M. struck another student with his head three times after being prevented from taking a snack from the other student's lunch tray.

B.M.'s parents were kept apprised of these behaviors by District faculty. Concerned that these behaviors were interfering with B.M.'s progress, they sent a letter to the District to request that a functional behavior assessment be conducted to better understand why these behaviors were occurring and how to control them. They also asked for the assessment to be performed by a behavioral analyst at the Berks County Intermediate Unit[6] with whom B.M.'s parents were familiar. The District agreed to the request, and it contacted the Intermediate Unit the following day to seek its assistance.[7]

Toward the end of November, B.M.'s parents met with District representatives and the behavioral analyst to lay the groundwork for the functional behavior assessment. During the meeting, they identified B.M.'s behaviors of striking himself in the head and striking others with his head as two particular behaviors of concern to study. Over the next few weeks, data was collected on these behaviors to determine their frequency and timing. They found that B.M. struck his head approximately 62 times per day and struck others with his head approximately 60 times per day. Their hypothesis was that he struck his head "to gain sensory stimulation and to gain increased adult attention" and struck others with his head when frustrated, such as when he was refused permission to engage in certain activities or when told to perform a certain task.[8]

A report of these findings was finalized on December 19, together with a proposed positive behavior support plan designed to recognize and control these behaviors. That same day,

---

[4]        "Scripting" refers to a behavior of "repeating lines from movies, TV shows and books," sometimes "hundreds of times a day." Christine Gralow, *It Bears Repeating*, N.Y. Times (Oct. 15, 2008, 9:00 PM), https://lessonplans.blogs.nytimes.com/2008/10/15/it-bears-repeating.

[5]        Ex. P-1, at 3-4.

[6]        School districts in Pennsylvania are organized under various "intermediate units," which provide support and services for the individual districts. *See* 24 Pa. Stat. §§ 9-901-A, 9-902-A.

[7]        The timing of the District's response to this request was not explicitly mentioned in the hearing officer's decision, but the record shows that B.M.'s parents' letter to the District was dated October 3, 2012, Ex. S-14, and the District sent a fax to the Intermediate Unit the following day, October 4, requesting assistance in conducting the behavior assessment, Ex. S-15.

[8]        Ex. S-26, at 3.

B.M.'s IEP was amended to incorporate that support plan. By late January, District faculty observed a "noted improvement" in the number of times he struck his head into others.[9]

In late March, the independent reevaluation of B.M. was completed, which was delivered to the District along with recommendations for his IEP. A notable point of difference between those recommendations and his current IEP was a recommendation to place B.M. in a dedicated autism support classroom, where he could be educated along with other autistic students, rather than the learning support classroom he was currently attending, where he was educated alongside other students with various types of learning needs. The independent evaluators acknowledged that the IEP the District had crafted targeted B.M.'s particular needs as an autistic student, but they were concerned that addressing those needs in the environment of the learning support classroom may leave little opportunity for him to participate in group instruction with similarly-situated peers. In their view, the ideal setting for him would be a hybrid environment, where he would receive "communication, social skills and behavior" instruction in an autistic support classroom (those being areas of his greatest difficulty), language arts instruction in an ordinary kindergarten classroom, with one-on-one support available (because his language arts skills were comparable to his peers), and mathematics instruction in a small-group, learning support environment (because they believed that he showed signs of having a mathematics disorder).[10]

The problem with that recommendation was that an autism support classroom was not available for kindergarten-aged students at Brandywine Heights. The independent evaluators suggested considering placing B.M. in a dedicated autism support classroom at a different school, but that would have come at a substantial tradeoff. Brandywine Heights was a familiar environment for B.M.—he lived just down the street, and before he enrolled, he was already "very familiar" with the school from accompanying his mother to Parent-Teacher Club meetings.[11] Sending him to another school would have deprived him of those familiar surroundings, and for B.M., transitions from one environment to another were a substantial source of concern.

At the end of May, toward the end of B.M.'s kindergarten year, his parents met with District representatives to discuss the independent evaluation. They discussed implementing at least two of the recommendations: a math program called "TouchMath," which had a high degree of success, and the possibility of B.M. receiving language arts instruction in an ordinary classroom with his peers.[12] The District's director of special education also mentioned that the District anticipated being able to offer an autistic support classroom for B.M.'s first-grade year due to an increase in the number of autistic students in the District at that age level. The District

---

[9]      Ex. S-35, at 12-13. In an email dated February 1, 2013, the District's director of special education mentioned that while the faculty had observed some instances of B.M. striking others with his head recently, it was "certainly not as many as when [the District] was collecting baseline data" in November and December. *See* Ex. P-1, at 26.

[10]     Ex. S-32, at 21-23.

[11]     Hr'g Tr. 56:22-25, 58:2-8.

[12]     Hr'g Tr. 141:15-143:14.

also anticipated being able to offer him the ability to receive instruction in a program called "verbal behavior"—a "research based program of instruction [that is] utilized to teach communication skills."[13] B.M. had received verbal behavior instruction during his time in the early intervention program, but the District had suspended offering that service in 2010 due to an insufficient number of eligible students.

Along these lines, the District prepared a new IEP for B.M. toward the start of his first-grade year. Rather than receiving instruction in the learning support classroom, he was transitioned to the new autism support classroom with a plan for him to be included in general education settings for approximately a third of each day. The District also planned to provide him with verbal behavior instruction, though that instruction did not begin until November of B.M.'s first-grade year because the teacher trained in the verbal behavior program, who had just been hired earlier that year, was on maternity leave.

B.M.'s parents filed a due process complaint partway through his first-grade year, on February 24, 2014, challenging the sufficiency of the education that B.M. had received at Brandywine Heights. A Pennsylvania Special Education Hearing Officer held three days of hearings between May and July 2014 and issued a forty-page written decision in August.

The hearing officer concluded that from September 19, 2012, to February 1, 2013—approximately the first two-thirds of B.M.'s kindergarten year—the District failed to provide B.M. with a free appropriate public education. In his view, the District did not properly plan for or control B.M.'s physically disruptive behaviors, which impeded his learning to the point that he was deprived of a meaningful educational benefit. The hearing officer found that the District had been aware from its knowledge of B.M.'s experience in early intervention that he had a history of disruptive behaviors, but the IEP the District prepared for him at the start of his kindergarten year did not adequately identify and target those behaviors.

He attributed this problem in part to deficiencies in a behavioral assessment that had been conducted as part of the reevaluation the District performed prior to the start of B.M.'s kindergarten year. He found that the behavioral assessment "jumbled numerous disparate behaviors, poorly defined, into one overall category, and did the same with the functions of those behaviors, rendering the assessment of little value in planning intervention."[14] In the hearing officer's view, that lack of clarity was partly to blame for the inadequacy of the behavioral intervention plan that was incorporated into the IEP.

The hearing officer also faulted the District for waiting an unreasonable amount of time to begin the reevaluation. As mentioned, B.M.'s parents met with District representatives in January 2012, while B.M. was still attending the early intervention program, to discuss B.M.'s transition to Brandywine Heights. At that meeting, B.M.'s parents signed an intent-to-enroll form, committing B.M. to begin kindergarten in the District that fall, but the District did not send

---

[13]      Decision at 2 ¶ 7. ("Decision" refers to the hearing officer's written decision, a copy of which is included in the administrative record).
[14]      Decision at 25-26.

a permission-to-reevaluate form to B.M.'s parents—the first step in the reevaluation process—until nearly the end of April. As a result, the reevaluation was not completed until September 7, and B.M.'s new IEP was not completed until September 19—nearly a month into his kindergarten year. In the hearing officer's view, that delay was "inappropriate in the circumstances of this matter."[15]

In sum, the hearing officer concluded the reevaluation was delayed too long, and when it was completed, the portion that dealt with B.M.'s problematic behaviors did not accurately analyze them, which—along with the District's failure to heed the record of B.M. engaging in those behaviors during early intervention—led to the implementation of an IEP at the start of B.M.'s kindergarten year that lacked an effective plan to control his behaviors. The hearing officer found that it was not until February of B.M.'s kindergarten year that the District, with the help of the functional behavior assessment that was performed by the behavioral analyst from the Berks County Intermediate Unit, was able to bring B.M.'s behaviors under control to a level that permitted him to learn.

The hearing officer concluded that compensatory education was in order. He chose September 19 as the start date because that was the date that the IEP, and its inadequate behavior support plan, were put in place, and he chose February 1 as the end date because he found that by then, the new behavior support plan recommended by the behavioral analyst "began to show positive effects on [B.M.'s] behavior."[16]

But the hearing officer also concluded that since that time, B.M. has been afforded the free appropriate public education he is due. After an extensive review of B.M.'s kindergarten and first-grade IEPs, and the process the District followed to craft them, he found that they included "appropriate and thorough present levels of functioning, goals that addressed [B.M.'s] educational needs and [that] were constructed so as to be measurable, and specially designed instruction and modifications that met [B.M.'s] disabilities" by providing for "small group special education services, individualized for [him] through the provision of specially designed and related services that targeted [his] most serious communication, attention, sensory and fine motor disabilities."[17] He also found that progress data in the record confirmed that B.M. "made progress that was meaningful in view of [his] profound combination of cognitive disabilities."[18]

He was careful to note that he was not suggesting that "the District's educational services were perfect, or even that they offered [B.M.] the best possible level of service," and he recognized that B.M.'s "[p]arents, in their diligence, [had] pointed out and pressed for remediation of a number of flaws and failures in the IEPs and . . . programs."[19] But he explained that the IDEA does not require a District "to provide the best possible program to a student" or to

---

[15]     Decision at 25.
[16]     Decision at 26-27.
[17]     Decision at 27-28.
[18]     Decision at 28.
[19]     Decision at 24, 28.

"incorporate every program that parents desire for their child," and he found that in many—"if not most"—cases, the District responded to the concerns of B.M.'s parents "by improving the services and doing what [they] reasonably proposed."[20]

Against that backdrop, he declined to award any further compensatory education after February 1 of B.M.'s kindergarten year.

The District responded by filing this action, claiming that the hearing officer erred in awarding compensatory education. B.M's parents counterclaimed, contending that the hearing officer should have awarded compensatory education for all of B.M.'s first two years at Brandywine Heights. The two sides have each moved for judgment on the administrative record.[21]

## III.   Standard of Review

 A party aggrieved by a hearing officer's decision may challenge the decision in a district court, and the court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2). But that is not an "invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). The IDEA obligates the reviewing court to receive the record generated from the hearing below, and that implies that the court must give "due weight" to that proceeding. *Id.*; *see* § 1415(i)(2)(C)(i).

That translates to a standard of review that is characterized as "modified *de novo*." *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003). In practice, it means that the hearing officer's factual findings "are to be considered prima facie correct," and the court is "required to defer to [those] factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record."[22] *Id.* If the court does decide to deviate from those findings "it must explain why," in order to "avoid the impression that it is substituting its own notions of sound educational policy for those of the agency it reviews." *Id.*

The hearing officer's legal conclusions are reviewed de novo. *Id.*

## IV.   The Compensatory Education Award

The District argues that the hearing officer erred as a matter of law by awarding compensatory education starting on September 19, 2012, without affording it a "reasonable

---

[20]     Decision at 24, 28.

[21]     Before the parties filed their motions, the Court granted a threshold request by B.M.'s parents to supplement the administrative record with two additional documents: an IEP from December 2014—approximately four months after the hearing officer rendered his decision—and a verbal behavior progress report from May 2014, which one of the witnesses at the hearing had referenced but was unable to present at the time. The Court admitted both over the District's objection because it appeared that the documents "may have at least some relevance and use to the Court's review" of the hearing officer's decision. *See* Mem. Op. & Order, ECF No. 24.

[22]     "Nontestimonial," because "a District Court must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion,'" much as an appellate court must defer to the credibility assessments of a trial court. *Shore Reg'l High Sch. Bd. of Educ.* v. *P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (quoting *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 529 (3d Cir. 1995)).

rectification period" to address the problematic behaviors that emerged only a few weeks earlier, during the first few days after B.M. started kindergarten. The District believes that it should have been afforded at least a month to determine whether B.M.'s behaviors required intervention, plus two months after that to evaluate those behaviors (since Pennsylvania regulations permit schools to take up to sixty days to conduct a reevaluation, 22 Pa. Code § 14.124(b)), plus another unspecified period of time after that to review the results and develop a new behavior support plan.

This argument misapprehends the reasoning behind the hearing officer's conclusion that the District fell short of its IDEA obligations. The hearing officer did not suggest that the District took too long to respond to new, never-before-seen behaviors that first emerged after B.M. started kindergarten; he found that the IEP the District crafted failed to properly plan for behaviors that B.M. had a history of engaging in—a history that the District knew about in advance. *See* Decision at 24 ("The evidence is preponderant that, for two years before [B.M.] transitioned to the District's kindergarten program, the District was on notice that . . . Student had a history of serious maladaptive behaviors that interfered with [his] learning and that of [his] peers.").

It is true that a school district may not always "be able to act immediately to correct an inappropriate IEP," particularly if the district is confronted with a "complex problem" that requires time to address, and for that reason, it is appropriate to exclude from any compensatory education award "the time reasonably required for the school district to rectify the problem." *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). But in this case, the hearing officer found that the District had ample notice of the types of disruptive behaviors that B.M. had been known to engage in and ample time to put in place a proper plan to address them, but ultimately failed to craft an IEP that was responsive to those concerns. This is not a case where the District needed time to react to a previously-unforeseen deficiency in an IEP.

Taking a different tack, the District turns to the IDEA's "child find" doctrine for support. Under the IDEA, "[s]chool districts have a continuing obligation . . . to identify and evaluate all students who are reasonably suspected of having a disability"—hence the term "child find"—but the IDEA recognizes that schools must be afforded "a reasonable time" to identify and evaluate a student once the school suspects that the student has a disability. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012). The District suggests that because B.M.'s disruptive behaviors had ceased by the end of the early intervention program, it should have been afforded a reasonable period of time after they reemerged to identify them as attributable to B.M.'s disabilities and conduct an evaluation.

This argument too misses the mark. As a threshold matter, neither the hearing officer's decision nor the record supports the District's contention that B.M.'s disruptive behaviors had completely ceased by the end of his time in the early intervention program. The hearing officer found that the records furnished by the Berks County Intermediate Unit—where B.M. attended early intervention—contained conflicting reports about whether these behaviors had stopped, or

whether they still occurred at times. *See* Decision at 3 ¶ 9. And the District's own director of special education testified that B.M.'s early intervention teacher had informed the District prior to B.M.'s arrival that his tendency to strike his own head "had diminished, but it wasn't completely gone" and cautioned the District that his disruptive behaviors may increase as a result of the transition from one environment to another. Hr'g Tr. 256:15-257:7-10.

That aside, there is a second, more fundamental problem with the District's line of reasoning. The "child find" concept deals with a school's obligation to identify and evaluate all students "*suspected* of having a *disability*." *Ridley*, 680 F.3d at 271 (emphasis added). Its purpose is to ensure that each school has "a system in place to identify, locate, and evaluate all children . . . who have disabilities and need special education and related services." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009). Schools are afforded a reasonable amount of time to discharge this duty in part out of recognition that they need not necessarily "jump to the conclusion that [a particular student's] misbehavior denote[s] a disability or disorder." *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3d Cir. 2012).

But in this sense, B.M. had already been "found." The District knew before B.M.'s first day that he was a student with autism who had a history of engaging in disruptive behaviors, and it already had knowledge about his background from the early intervention program. This is not a case where the District needed to be afforded "a reasonable time to identify [him] as disabled" before it could be expected to implement an appropriate plan to address his needs. *See Ridley*, 680 F.3d at 272.

For these reasons, the Court finds no error in the hearing officer's conclusion that compensatory education was warranted from at least as early as September 19, 2012.[23]

The Court parts company with the hearing officer on his conclusion that the period of compensatory education should begin on September 19—the date that B.M.'s kindergarten IEP was put in place—instead of B.M.'s first day of kindergarten, August 26. The hearing officer did not explain why he rejected awarding compensatory education for those first few weeks of B.M.'s kindergarten year, and in the Court's view, his finding that the District waited an unreasonably long time to begin its reevaluation of B.M. prior to his enrollment at Brandywine Heights—a finding which the Court sees no reason to disturb—compels the conclusion that the period of compensatory education should start on August 26.

As mentioned, it was during a meeting in January 2012 that B.M.'s parents signed an intent-to-register form for B.M. and agreed with the District that he should be reevaluated as part of the transition, but the District then waited more than three months, until April 24, to send a permission-to-reevaluate form to B.M.'s parents—the first step in the reevaluation process. As a

---

[23]    To the extent the District disputes the hearing officer's underlying finding that the behavior support plan included in the September 19, 2012 IEP failed to accurately catalogue B.M.'s disruptive behaviors and target them effectively, or his finding that B.M.'s behaviors were occurring with sufficient frequency and magnitude between August 2012 and January 2013 to prevent him from learning, the Court sees no evidence in the record to disturb those findings.

result, the reevaluation was not completed until September 6, and B.M.'s IEP was not completed until September 19. During those first few weeks, the District implemented B.M.'s IEP from early intervention, but that IEP did not contain a behavior support plan. *See* Ex. S-3.

The hearing officer found both that the District's delay was unreasonable, and that the reevaluation, once complete, did not accurately capture the history and nature of B.M.'s disruptive behaviors, which led to the formulation of a behavior support plan for the September 19 IEP that was inadequate. These findings the hearing officer made lead to the conclusion that if the District had commenced the reevaluation timely, and if the reevaluation had assessed B.M.'s history of behaviors comprehensively and accurately, a new IEP could have been in place by his first day of kindergarten that could have afforded him a meaningful educational benefit from the start. *See* Decision at 26 (concluding that "the District's inappropriate delay in providing a data based [functional behavior assessment] deprived [B.M.] of educational benefit"). In the Court's view, that means that B.M. is entitled to compensatory education starting on August 26.

The District contends that it should not be faulted for this delay because neither "the IDEA nor . . . any other state or federal regulation" obligates it to conduct any reevaluation *at all* of an incoming student prior to the student's arrival—at least where the student already has a current IEP from a previous program and has been evaluated within the last three years, as was the case with B.M. *See* Pl.'s Br. 14, ECF No. 25-1. Indeed, guidance from the Pennsylvania Department of Education confirms that when a student transitions from early intervention to an ordinary classroom setting, the school district and the student's parents have the choice of either conducting a reevaluation or forgoing the reevaluation and relying on an existing IEP. Pa. Dep't of Educ., *Early Intervention Transition: Preschool Programs to School-Aged Programs* 3 (2003).[24]

But in this case, B.M.'s parents and the District decided that a reevaluation was in order, and that same guidance provides that whichever course of action is chosen—whether it be to conduct a reevaluation or implement an existing IEP—the school district must initiate the chosen course of action "[w]ithin a reasonable period of time from the receipt of the signed Intent to Register form, but no later than April 15." *Id.* at 3-4; *see also* 34 C.F.R. § 300.303(a) (providing that a school district must conduct a reevaluation once the district determines that the needs of the child warrant a reevaluation or a parent requests one). Because B.M.'s parents and the District chose to conduct a reevaluation, the District was obligated to start that process within a reasonable period of time after his parents signed the intent-to-enroll form, and the hearing officer found that waiting three months was not reasonable under these circumstances. For that reason, compensatory education is warranted from the start of B.M.'s kindergarten year.

The District also takes issue with the other end of the compensatory education award: the hearing officer's selection of February 1, 2013, as the end date. The District believes that compensatory education should be awarded for no longer than December 19, 2012—the date that

---

[24]     The District itself submitted a copy of this guidance as an exhibit to its motion, *see* ECF No. 25-2, and both sides have assumed that this guidance accurately describes their rights and duties during the transition process.

the District implemented a new behavior support plan based on the functional behavior assessment performed by the behavioral analyst from the Berks County Intermediate Unit at the parents' request. In the hearing officer's view, February 1 was the proper date because he found that it was not until then that the new behavior support plan "began to show positive effects on [B.M.'s] behavior." Decision at 26-27.

The Court sees no error in the hearing officer's approach. Compensatory education is an equitable remedy, designed "to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 608 (3d Cir. 2015) (quoting *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)). The fact that it took the District six weeks to bring B.M.'s behaviors under control after implementing the new behavior support plan can be traced directly back to the District's failure to control those behaviors during the preceding four months. By the time the new plan was put in place in December, B.M. was striking his head approximately 62 times per day and striking others with his head approximately 60 times per day—nearly once every three minutes in a six-and-a-half-hour school day. It is not difficult to see that the District's inability to reduce B.M.'s behaviors to a manageable level until February—even with the benefit of the new behavior support plan—is attributable to the fact that the District allowed those behaviors to get out of hand from the start. That means that compensatory education is appropriate for that period. *See B.D. v. District of Columbia*, 817 F.3d 792, 798 (D.C. Cir. 2016) (suggesting, hypothetically, that if a school district denied a student a free appropriate public education for one month, but that one-month denial had collateral effects that undercut the student's education during other months when the student was being provided a proper educational program, compensatory education for that entire period would be warranted).

Ultimately, "a court finding a deprivation of a free appropriate public education should return a child to the educational path he or she would have traveled had the educational agency provided that child with an appropriate education in the first place," *id.* at 620, and in the Court's view, that is what the hearing officer's grant of compensatory education is calculated to do.

## V.     The Lack of Additional Compensatory Education

B.M.'s parents argue that B.M. was not afforded a free appropriate public education for any of his first two years at Brandywine Heights. They believe that neither his kindergarten nor his first-grade IEPs met the IDEA's requirements, which means that B.M. should be awarded two years of compensatory education. The Court agrees with the hearing officer that once the District incorporated an appropriate behavior support plan into B.M.'s kindergarten IEP and reduced his disruptive behaviors "to manageable levels that permitted learning," Decision at 26, he received the free appropriate public education that the IDEA guarantees.

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 2017 WL 1066260, at *10. Progress is the touchstone, because "the

essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *See id.* Any other yardstick "would do little to remedy the pervasive and tragic academic stagnation" that prompted the passage of the IDEA in the first place. *Id.*[25]

But progress for one student is not the same as progress for another. "[B]enefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable at the other end, with infinite variations in between," *id.* (quoting *Rowley*, 458 U.S. at 202), so the IEP must be evaluated through the lens of the student's "present level of achievement, disability, and potential for growth." *Id.*

It must be remembered that the "the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* "[A] state is not required to maximize the potential of every handicapped child, . . . provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley*, 680 F.3d at 269 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir 2010)). The passion parents harbor for their child's success may be considerable, but "the IDEA guarantees to a disabled child 'an education that is appropriate, not one that provides everything that might be thought desirable by loving parents.'" *Id.* (quoting *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989)).

The hearing officer examined both B.M.'s kindergarten and first-grade IEPs in some detail. He found that both IEPs provided "appropriate and thorough present levels of functioning"; indeed, he found that they contained "extensive" information about B.M.'s present functioning. *See* Decision at 27, 32; 20 U.S.C. § 1414(d)(1)(A)(i)(I) (providing that an IEP must contain "a statement of the child's present levels of academic achievement and functional performance"). He also found that the IEPs contained "goals that addressed [B.M.'s] educational needs and [that] were constructed so as to be measurable," *see* § 1414(d)(1)(A)(i)(II)-(III) (providing that an IEP must contain "a statement of measureable annual goals, including academic and functional goals" and must describe "how the child's progress toward meeting the annual goals . . . will be measured"), "and [provided for] specially designed instruction and modifications that met [B.M.'s] disabilities in such a way as to permit access to the relevant curricula," *see* § 1414(d)(1)(A)(i)(IV) (providing that an IEP must contain "a statement of the

---

[25]     In *Endrew F.*, which was decided just last week, the Supreme Court clarified that an IEP designed only "to confer an 'educational benefit [that is] merely . . . more than *de minimis*'" is not enough to satisfy the IDEA. 2017 WL 1066260, at *8. Prior to that decision, some circuits had suggested that as long as an educational plan was calculated to confer something more than a *de minimis* benefit, that was all that was needed. The Third Circuit had once been one of them, but it corrected that mistake more than a decade ago. *See L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) ("At one time, we only required that a child's IEP offer 'more than a trivial or de minimis educational benefit'; more recently, however, we have 'squarely held that "the provision of merely 'more than a trivial educational benefit' does not meet" the meaningful benefit requirement' [announced in the Supreme Court's 1982 decision in *Rowley*]." (citation omitted) (quoting *T.R. v. Kingwood Township*, 205 F.3d 572, 577 (3d Cir. 2000))). While the hearing officer did not have the benefit of *Endrew F.* when he issued his decision, he did not make the same mistake that some courts have made. He correctly recognized that an IEP "must be 'reasonably calculated' to enable the child to receive 'meaningful educational benefits,'"—not just more than mere *de minimis* benefits—which he explained means that the child must be afforded "the opportunity for 'significant learning.'" *See* Decision at 23.

special education and related services and supplementary aids and services" to be provided). *See* Decision at 27-28.

The IEPs also addressed B.M.'s placement, with an eye toward inclusion in general education settings with his peers. *See* § 1414(d)(1)(A)(i)(V) (providing that an IEP must contain "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class"). His kindergarten IEP provided for placement in a full-time learning support classroom, with a teacher who, while not a holder of a certificate specifically in autism instruction, had six years of experience teaching in an autism support classroom and who had attended "numerous" trainings and conventions in autism instruction. *See* Hr'g Tr. 435:6-10 511:10-13. B.M. was also assigned a full-time paraprofessional. The IEP planned for him to initially spend approximately twelve percent of each day with his peers during non-academic activities (with the help of supplementary aids and services), and aimed to gradually integrate him further into the general education setting. By the time of his first-grade IEP, his involvement in general education settings was upgraded to approximately thirty-five percent of each day, and he was able to be placed into a dedicated autism support classroom for the remainder of each day.[26] In the hearing officer's view, "the District made extensive efforts to provide individualized services to address all of [B.M.'s] education needs." Decision at 29.

The hearing officer then crosschecked the *ex ante* sufficiency of the IEPs against B.M.'s actual progress during both years. While it must be remembered that "[t]he measure and adequacy of an IEP can only be determined as of the time it is offered to the student"—meaning that "a student's subsequent failure to make progress in school does not retrospectively render an IEP *per se* inappropriate"—evidence of a student's later progress may still be considered to the extent it sheds light on the reasonableness of the IEP at the time it was crafted. *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 761-62 (3d Cir. 1995) (quoting *Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993)); *see also Endrew F.*, 2017 WL 1066260, at *10 (stressing that an IEP need only be "reasonably calculated" to enable a child to make progress because "crafting an appropriate program of education requires a prospective judgment by school officials").

When he analyzed B.M.'s progress during those two years, the hearing officer found that B.M. "made progress that was meaningful in view of [his] profound combination of cognitive disabilities." Decision at 28. With respect to his kindergarten year, the hearing officer found that B.M. had made significant progress in a number of areas, both behavioral—such as attending to an activity for up to forty minutes at a time, transitioning to activities that he did not prefer with only three prompts or less, using functional language, signs, and verbalizations to request items that he wanted, and engaging in various functional activities like putting on his socks, shoes, and coat and cutting straight and curved lines—and academic, such as counting, writing beginning and ending consonant sounds, providing illustrations to correspond to stories, using logical

---

[26]    As previously mentioned, when B.M. reached first grade, there were enough students in need of autistic support at that age level for the District to offer a dedicated autistic support classroom.

phonetic spelling for unknown words, and understanding left-to-right progressions. The hearing officer found that in first grade, B.M. made significant progress in, among other things, sounding out irregular words, following novel one-step directions, identifying pictures representing common nouns, actions, and feelings, and was able to master first-grade-level skills in numbers, geometry, copying and extending patterns, and special subjects like art, library, music, technology, and physical education.

B.M.'s parents have pointed to a litany of areas where they believe that his instruction could have been improved. But while these criticisms may show—as the hearing officer acknowledged—that B.M.'s first two years at the District were not perfect, they do not show that the District failed to provide him with "an educational program reasonably calculated to enable [him] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 2017 WL 1066260, at *12.

Chief among those is his parents' criticism of the District's decision to place B.M. in a learning support classroom instead of a dedicated autistic support classroom during his kindergarten year. But as mentioned, when B.M. started at Brandywine Heights, there were not enough students at that grade level to offer a dedicated autism support classroom. For B.M. to be placed in an autistic support classroom, he would have had to attend a different school. As mentioned, that would have come at a significant tradeoff in light of the fact that B.M. had become familiar with Brandywine Heights, and the District's director of special education knew at the time the District was formulating his IEP that transitions from one environment to another were a major concern for him. Hr'g Tr. 256:15-18.

At Brandywine Heights, his teacher sought to tailor the learning support classroom to his needs. The classroom was self-contained, with a small class size, and the hearing officer found that the learning support teacher adapted the learning support program to B.M., both from her six years of experience teaching in a dedicated autism support classroom and by consulting with a fellow teacher who taught in an autism support classroom for older students. Decision at 9. As mentioned, the hearing officer found that "the District made extensive efforts to provide individualized services to address all of [B.M.'s] education needs." *Id.* at 29.

His parents also fault the District for failing to place him in an environment where he could receive instruction in "verbal behavior" during his kindergarten year—the aforementioned research-based method of instruction designed to increase communication skills in autistic students—which he had been receiving during early intervention. His parents point out that the IDEA "clearly places an emphasis on practices that are based on scientific research," *Ridley*, 680 F.3d at 277 (quoting *Assistance to the States for the Education of Children with Disabilities and Preschool Grants for Children with Disabilities*, 71 Fed. Reg. 46,540, 46,665 (Aug. 14, 2006)), and they contend that failing to provide him with verbal behavior instruction denied him a free appropriate public education.

But as the IDEA itself states, schools are obligated to implement research-based teaching methods only "to the extent practicable," § 1414(d)(1)(A)(i)(IV), and the U.S. Department of

Education has expressly rejected mandating schools to employ research-based teaching methods, recognizing that "there is nothing in the Act that requires all programs provided to children with disabilities to be research-based with demonstrated effectiveness in addressing the particular needs of a child where not practicable." *Ridley*, 680 F.3d at 276-77 (quoting 71 Fed. Reg. at 46,665). As mentioned, during B.M.'s kindergarten year, the District did not have the capacity to offer an autism support classroom with a dedicated teacher trained in verbal behavior instruction for students of B.M.'s age. Nonetheless, his learning support teacher, who herself had experience teaching in an autism support classroom, reached out to another teacher at the school who was certified in verbal behavior instruction to seek advice on techniques that she could implement in her classroom. Hr'g Tr. 515:10-18.[27]

Moreover, as the hearing officer pointed out, the reevaluation the District performed of B.M. did not recommend that he be given verbal behavior instruction. The independent evaluators—retained at his parents' request—reviewed the IEP that the District prepared for B.M.'s kindergarten year, which did not provide for verbal behavior instruction, and they nonetheless expressed the belief that the IEP the District crafted for him targeted his "very significant needs" for improved communication skills. Ex. S-32, at 23. That comports with the hearing officer's finding that B.M.'s kindergarten IEP provided "specially designed and related services that targeted [his] most serious communication . . . disabilities" and other needs. Decision at 27-28.

The District was able to provide an autistic support classroom for B.M. during his first-grade year, taught by a recently-hired teacher who was able to provide the verbal behavior instruction that B.M.'s parents sought. But, they fault the District for the fact that B.M.'s teacher was on maternity leave during the first two months of the year, which meant that the verbal behavior instruction did not commence until November. For the same reasons that the District did not violate the IDEA by failing to offer B.M. verbal behavior instruction during his kindergarten year, that contention is unavailing. Nor is the criticism they have leveled at his teacher's verbal-behavior credentials. In anticipation of B.M.'s first-grade year, his teacher attended a three-day training on verbal behavior instruction, and during the year, she continued to meet with consultants from the Pennsylvania Training and Technical Assistance Network (PaTTAN) on a monthly basis to refine her techniques. In B.M.'s parents' view, "she was learning the program while implementing it." *See* Defs.' Br. 39-40, ECF No. 26. But they fail to mention that before she joined Brandywine Heights, she had worked in a verbal behavior classroom, where she "implement[ed] verbal behavior with other students with autism, and . . . [had been] trained [by] consultants from PaTTAN." Hr'g Tr. 621:7-18. As mentioned, she continued to work with those consultants while teaching B.M., and between those meetings, she

---

[27]        At times in their brief, B.M.'s parents appear skeptical of the District's contention that there were not enough students at B.M.'s age level to allow it to offer a dedicated autism support classroom for his kindergarten year, but the hearing officer credited the District's explanation, and the Court sees no evidence in the record to disturb that finding.

worked with another verbal behavior teacher at Brandywine Heights, who served as her "verbal behavior internal coach." *Id.* at 654:3-9.

B.M.'s parents emphasize the fact that B.M. was not able to meet a number of his goals in his kindergarten and first-grade years, and that, by the end of first grade, some of his skills—such as reading and math—were still at a kindergarten level. The hearing officer acknowledged that B.M. did not succeed in each of his goals. Both for B.M.'s kindergarten year and his first-grade year, the hearing officer carefully reviewed each area of skill, noting each area in which B.M. made meaningful progress and each area in which he did not. *See* Decision at 14-15, 18-19. But he found that, on balance, B.M. "made progress that was meaningful in view of [his] profound combination of cognitive disabilities." *Id.* at 28. While he recognized that B.M.'s failure to keep pace with his grade-level peers in certain academic areas was a "serious concern," he correctly pointed out that whether a student has been afforded an opportunity for meaningful educational gain must be assessed "in light of the child's potential"—in this case, a child who has "a combination of cognitive disabilities that seriously compromised [his] ability to learn." *Id.* at 32-33. Where, as here, a student is "not fully integrated in the regular classroom" and may "not be able to achieve on grade level" in all areas, "his educational program must be appropriately ambitious in light of his circumstances"—which may not mean "grade-level advancement." *See Endrew F.*, 2017 WL 1066260, at *11 (discussing the IDEA's requirements in the context of a student with autism). The "core of the IDEA" is the need to "focus on the particular child"; there is no "one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." *Id.* at *8, 10 (quoting *Rowley*, 458 U.S. at 202). For that reason, the Supreme Court has twice rejected the contention that a school violates the IDEA if it does not "provide a child with a disability opportunities to achieve academic success . . . that are substantially equal to the opportunities afforded children without disabilities." *See id.* at *12 (citing *Rowley*, 458 U.S. at 198). Just as B.M.'s educational program "must be '*specially* designed' to meet [his] '*unique* needs," so too must the adequacy of that program be measured against his "levels of achievement, disability, and potential for growth." *Id.* at *10 (quoting § 1401(14), (29)).

The Court has carefully reviewed each criticism B.M.'s parents have levied at the education he has been afforded, but the Court agrees with the hearing officer that the educational program the District crafted for him for his first two years—once it appropriately addressed his disruptive behaviors that interfered with his learning—was reasonably calculated to enable B.M. to make appropriate progress.[28]

---

[28] B.M.'s parents also criticize the reevaluation of B.M. that the District performed in anticipation of his arrival at Brandywine Heights, which informed the design of his kindergarten IEP. Primarily, they take issue with the fact that, in their view, that reevaluation did not include a proper functional behavior assessment. *See* 22 Pa. Code § 14.133 (providing that if a student exhibits behaviors that interfere with learning, the IEP team must develop a positive behavior support plan that is based on a functional behavior assessment). But even if that is the case, that will be remedied by the compensatory education award that B.M. is to receive. He is entitled to compensatory education from his first day of kindergarten until February 1, 2013, and by then, the behavioral analyst from the

**VI.     Conclusion**

The hearing officer correctly concluded that B.M. is entitled to compensatory education until February 1, 2013, of his kindergarten year but should have started that award on his first day of kindergarten—August 26, 2012—rather than September 19. Otherwise, the Court agrees with the hearing officer that after February 1, B.M. received a free appropriate public education.[29] Accordingly, the hearing officer's decision is affirmed in part and reversed in part. A separate order follows.

---

Berks County Intermediate Unit had conducted a formal functional behavior assessment, and the District had incorporated the results of that assessment into his IEP. In all other respects, the Court agrees with the hearing officer's finding that the reevaluation was comprehensive and addressed all areas of suspected disabilities.

[29]     In a footnote in their brief, B.M.'s parents mentioned that they were also seeking relief under § 504 of the Rehabilitation Act of 1973, *see* Defs.' Br. 20 n.11, but they did not address the Act. Because the Court concludes that B.M. was afforded a free appropriate public education after February 1, that is equally dispositive of any claim they sought to raise and preserve under § 504. *See Abington*, 696 F.3d at 253 n.8.